UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| WILLIE MAE CURVIN,<br><br>         Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>         Defendant. | Case No. 13-CV-123-JPS<br><br><br><br>ORDER |

  The plaintiff in this case, Willie Mae Curvin, has appealed the October 18, 2011, decision of Administrative Law Judge Wayne Ritter ("the ALJ"), finding that Ms. Curvin is not disabled and therefore denying her claim for disability benefits. (Tr. 22).

  Ms. Curvin suffers from a number of health issues, including glaucoma, an overactive thyroid, high blood pressure, difficulty sleeping, and pain in her knee. (*See, e.g.*, Tr. 17–19). The ALJ evaluated the way in which those issues impact Ms. Curvin's ability to work and determined that, in spite of her health issues, Ms. Curvin retained the ability to work both her prior job as a personal care worker as well as a number of other medium exertional jobs that exist in Wisconsin. (Tr. 20–21). Accordingly, the ALJ determined that Ms. Curvin is not disabled, and therefore denied her request for benefits. (Tr. 22). The Social Security Appeals Council declined Ms. Curvin's request for review, making the ALJ's decision final.

  On February 5, 2013, Ms. Curvin appealed the ALJ's decision to this Court. That appeal is now fully briefed (Docket #16, #19, #21), and the Court has received additional briefs from the parties on the issue of allegedly sanctionable post-hoc justifications offered by the Commissioner (Docket #25,

#28). Having reviewed all of these materials, the Court concludes that it must vacate and remand the ALJ's decision.

1. BACKGROUND

   1.1 General Information About Ms. Curvin

Ms. Curvin is 60 years old. (*See* Tr. 20). She is currently unemployed, but worked until January of 2009 as an in-home personal care assistant. (Tr. 140). After leaving work as a personal care assistant, Ms. Curvin drew unemployment benefits for two years before filing her request for disability benefits. (Tr. 16).

Ms. Curvin is generally not active. She lives at a senior living facility, where her daily activities consist of housekeeping, personal care, and preparing simple meals. (Tr. 147). She reports that she can drive (though her abilities are limited) and she does buy groceries at the store, but that she does not go out of the house often. (Tr. 150–51, 154). Her recreational activities seem limited to watching television, reading, and crafting. (Tr. 151).

   1.2 Medical Evidence

Ms. Curvin suffers from a number of health issues, each of which the Court addresses in further detail in the discussion that follows.

      1.2.1 Glaucoma

Glaucoma is perhaps the most serious of all of Ms. Curvin's health issues. Her treating doctor, Steve Christensen, diagnosed her condition as advanced "end stage glaucoma" in her right eye. (Tr. 246, 248). A second doctor, Amy Moschell, agreed, finding that Ms. Curvin suffered "fairly severe glaucomatous damage to the right eye," and found that vision in Ms. Curvin's right eye could only be corrected to 20/40. (Tr. 267). Dr. Moschell also noted that Ms. Curvin's peripheral vision was "quite restricted." (Tr.

267). Both doctors agreed that Ms. Curvin's left-eye glaucoma was less severe. (Tr. 248, 267). Specifically, Dr. Moschell found that the glaucoma in Ms. Curvin's left eye caused "only mild visual filed changes" and that vision in her left eye could be "corrected to 20/20 at both distance and near." (Tr. 267). To treat her glaucoma, Ms. Curvin self-administered several prescription eye drops, including Dorzolamide, Timolol, Alphagan, Cosopt, and Xalatan. (Tr. 226, 266).

Ms. Curvin's treating doctor, Dr. Christensen, provided a medical opinion that the glaucoma should have little impact on Ms. Curvin's ability to work. (Tr. 318–21). More specifically, Dr. Christensen opined that Ms. Curvin's glaucoma would not dramatically effect her ability to: work an eight hour day; stand, sit, lift, or make multiple postural adjustments; perform multiple common physical functions, such as reaching, handling, feeling, seeing, and hearing; or to work in multiple different types of environments, such as at heights, in extreme temperatures, or around chemicals. (Tr. 318–20). In fact, Dr. Christensen believed that Ms. Curvin's glaucoma would limit only her ability to work around machinery. (Tr. 320). He listed no other limitation that the glaucoma would impose. (Tr. 318–21). In discussing the impact of the glaucoma on Ms. Curvin's sight, Dr. Christensen emphasized that, while Ms. Curvin's right eye was significantly impaired, she had "<u>full</u> visual fields in left eye." (Tr. 320 (emphasis in original)).

Despite her vision problems, Ms. Curvin retained the ability to drive, but would not do so at dawn or dusk or in poor weather conditions. (Tr. 153).

### 1.2.2 Sleep Issues

On July 2, 2009, and December 22, 2009, Ms. Curvin reported to a doctor that, for years, she had difficulty sleeping. (Tr. 208–09). In connection with the first of those doctors appointments, Ms. Curvin stated that she felt "tired and drained." (Tr. 209). She experimented with several different prescription sleep aids, including Rozerem and Lunesta, and found that Lunesta worked best for her. (Tr. 208). Her insurance refused to pay for Lunesta for a period of time; however, that problem had apparently been resolved by the time Ms. Curvin applied for benefits, as she reported that she took prescription Lunesta on her disability report. (Tr. 142). Her sleep problems remained ongoing as of a follow-up appointment she attended on April 26, 2010. (Tr. 235–36). Ms. Curvin mentioned that her sleep problems affected her ability to work and attend appointments because, if she were to miss a night of sleep, she would wake up tired, angry, upset, and with diminished ability to drive and reach locations on time. (Tr. 154).

### 1.2.3 Overactive Thyroid

Ms. Curvin was diagnosed with an enlarged and overactive thyroid. (*E.g.*, Tr. 226, 229). To control her thyroid issues, Ms. Curvin took the prescription drug Synthroid. (*E.g.*, Tr. 226, 229). She was compliant with her medication and, while her thyroid remained enlarged, she did not complain of any problems that her doctor readily traced to her thyroid issue. (*E.g.*, Tr. 226, 229).

### 1.2.4 High Blood Pressure and Heart Problems

Ms. Curvin was prescribed Hyzaar for treatment of her high blood pressure but, according to progress notes, her high blood pressure was under "fair control" with current medications. (*E.g.*, Tr. 208, 226, 229). There are no

indications in the record that her high blood pressure caused her any problems in terms of physical activity or completing work. She did discuss that she suffered from an occasionally rapid heartbeat that had required her to seek emergency room treatment, but she did not state that this would affect her ability to work . (Tr. 34).

### 1.2.5 Knee, Spine, and Other Body Pain

Ms. Curvin has complained to her doctors of a number of types of pain over the years. This includes pain in her knee (Tr. 32), neck (Tr. 226), coccyx (Tr. 208), and right flank (which was related with pain in urination) (Tr. 327). Ms. Curvin has mild degenerative changes in both her knee and coccyx. (Tr. 32, 209, 213). The medical basis for her neck and flank pain is unclear. Nonetheless, Ms. Curvin received a prescription for Tylenol #3, a narcotic painkiller, to treat her knee and flank pain. (Tr. 32, 327–28).

Despite these problems, Ms. Curvin did not list them in either her function or disability reports. (Tr. 137–154). In fact, while Ms. Curvin said that she would have trouble lifting, walking, stair climbing, squatting, and kneeling, on her function report, she noted that all of these problems "are because I don't get a good night sleep reg[ularly]."

### 1.3 Disability Application and ALJ Decision

Ms. Curvin filed her application for disability and disability insurance benefits on March 15, 2010, alleging that her disability began on January 29, 2009. (Tr. 14). That claim was denied initially and upon reconsideration, and Ms. Curvin thereafter filed a request for a hearing. (Tr. 14). The ALJ conducted that hearing on August 23, 2011, at which time Ms. Curvin testified and was represented by an attorney. (Tr. 14). Vocational expert David Ostwald appeared at the same hearing as a vocational expert. (Tr. 14).

The ALJ issued his decision on October 18, 2011, finding that Ms. Curvin retained the ability to work both her prior form of employment as well as other medium exertional jobs; he, therefore, found that she is not disabled and denied her claim for benefits. (Tr. 20–22). In reaching that decision, the ALJ noted at Step Two that, of all of Ms. Curvin's medical issues, he found only her glaucoma to be a severe impairment. (Tr. 16). Nonetheless, having found a severe impairment, he proceeded on to the remaining steps. (Tr. 16). At Step Three, the ALJ found that Ms. Curvin's conditions do not meet or medically equal a listed impairment. (Tr. 16–17). Turning to Step Four, the ALJ determined that Ms. Curvin's residual functional capacity (RFC) would allow her to perform a full exertional range of work with a nonexertional limitation of no peripheral vision on her right side. (Tr. 17). In reaching that determination, the ALJ discussed Ms. Curvin's own statements and testimony, her credibility, and the medical evidence. (Tr. 17–20). Finally, utilizing that RFC determination, the ALJ held that Ms. Curvin retained the capacity to perform both her past work as well as a number of other jobs at the medium exertional level, even with the nonexertional limitations on her vision. (Tr. 20–21). As such, the ALJ found that Ms. Curvin is not disabled.

Ms. Curvin requested review of that decision by the Appeals Council. (Tr. 8). The Appeals Council denied her request, making the decision of the ALJ final. (Tr. 1–3).

Ms. Curvin, in turn, appealed that decision to this Court, alleging that the ALJ erred in various ways in reaching his decision. (Docket #1). The matter is now before the Court for decision.

2.  DISCUSSION

   2.1   Standard of Review

The Court must, generally, apply a deferential standard when reviewing an ALJ's decision. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The Court cannot re-weigh the evidence, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

Rather, the Court must review the ALJ's decision to determine whether the findings were supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence exists when "a reasonable mind might accept [it] as accurate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). If, however, the Court concludes that the ALJ failed to build an "accurate and logical bridge" from the evidence to his conclusions, then the Court should reverse the ALJ's decision. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

When an ALJ commits an error of law in reaching his or her decision, the Court is required to reverse that decision, regardless of the volume of evidence that exists in support thereof. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

   2.2   Substantive Analysis

Ms. Curvin's opening brief is somewhat convoluted. It sets forth arguments regarding the "severity" of her medical issues, but seem to confuse the formal severity requirement of Step Two with the colloquial usage of the term "severe" that may play a role in the ALJ's RFC determination. Nonetheless, both the Commissioner's helpful response brief

and Ms. Curvin's reply serve to focus the discussion on that topic. Thus, the Court will first look to the ALJ's step-two evaluation of the severity of Ms. Curvin's impairments to determine whether the ALJ erred in that portion of his evaluation. Finding that the ALJ erred at Steps Two and Three, the Court finds that reversal is warranted.

### 2.2.1 Step Two

Ms. Curvin's primary argument regarding the Step Two analysis is that the ALJ erred by failing to adequately consider all of her impairments at that step. She also argues that the ALJ erred in failing to properly evaluate her credibility prior to making his Step Two determination.

With those issues in mind, a bit of background information on the Step Two determination is appropriate. At Step Two, the ALJ must determine whether the claimant has any medically determinable impairments through submission of objective medical evidence ("i.e., medical signs and laboratory findings"). 42 U.S.C. § 423(d)(1)(A); SSR 96-4p. If the ALJ finds that the claimant has established one or more medical impairments, then the ALJ must next determine whether the impairment or impairments are severe, by determining whether they "significantly limit" the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). *See also* 20 C.F.R. § 404.1520(a)(4)(ii). In making this determination, the ALJ is required to assess the credibility of the claimant's statements regarding his or her

ability to function and to consider the claimant's symptoms and their effect on the claimant's abilities. SSR 96-7p; SSR 96-3p.[1]

There are two potential outcomes at Step Two. First, the ALJ may find that the claimant's impairment or impairments are not severe. 20 C.F.R. § 404.1520(a)(4)(ii). In this case, the ALJ is obliged to find that the claimant is not disabled and to deny his or her claim for benefits. 20 C.F.R. § 404.1520(a)(4)(ii). On the other hand, the second potential outcome is that the ALJ finds *any* of the claimant's alleged impairments to be severe. 20 C.F.R. § 404.1520(a)(4)(ii). In this case, the ALJ must move on past Step Two, and perform Step Three (and potentially Steps Four and Five) of the evaluation process. 20 C.F.R. § 404.1520(a)(4)(ii)–(v). Step Three—like Step Two—requires the ALJ to consider "the medical severity," of the claimant's

---

[1]SSR 96-7p states that:

> Once the adjudicator has determined the extent to which the individual's symptoms limit the individual's ability to do basic work activities by making a finding on the credibility of the individual's statements, the impact of the symptoms on the individual's ability to function must be considered along with the objective medical and other evidence, first in determining whether the individual's impairment or combination of impairments is "severe" at step 2 of the sequential evaluation process for determining disability and, as necessary, at each subsequent step of the process.

This ruling clearly requires that the ALJ make a credibility determination prior to conducting the Step Two analysis, because information regarding the effects of the claimant's impairments (about which the claimant's testimony is extremely relevant) must play a role in Step Two's severity determination. *See also* SSR 96-3p ("A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairments…and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.").

impairment or impairments, to determine whether they meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairment or impairments meets or equals a listing in Appendix 1, then the ALJ is required to find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). Otherwise, the ALJ must determine the claimant's RFC; this requires that the ALJ consider *all* of the claimant's impairments—whether held to be severe or non-severe—to develop a determination of the claimant's capacity to work. 20 C.F.R. §§ 404.1545(a)(2), 404.1545(e).

In the decision under review, at Step Two, the ALJ found a severe impairment: Ms. Curvin's right-eye glaucoma. (Tr. 16). However, he also noted that Ms. Curvin's thyroid disorder and sleep disorder were "effectively addressed with medications," and that her left-eye glaucoma and right-knee degenerative joint disease were both "mild." (Tr. 16). Because the ALJ found "no objective medical evidence that any of these impairments result in significant work related limitations," he ultimately classified those impairments as non-severe. (Tr. 16).

Unfortunately, in making his Step Two findings, the ALJ failed to make a credibility determination or discuss Ms. Curvin's symptoms. (Tr. 16). He completely skipped over the required credibility determination and entirely failed to discuss any of Ms. Curvin's reported symptoms. (Tr. 16).

Nonetheless, because he had found a severe impairment at Step Two (Ms. Curvin's right-eye glaucoma), the ALJ continued on to Steps Three, Four, and Five. (Tr. 16–21). At Step Three, the ALJ noted that "no treating or examining physician has indicated that the claimant has an impairment or combination of impairments that meets or medically equals the severity of

a listed impairment." (Tr. 17). Thus, he concluded that, having "specifically considered the claimant's impairments under the appropriate listings… there is no objective medical evidence of an impairment or combination of impairments of listing level severity." (Tr. 17). As noted above, if the ALJ had determined that any of Ms. Curvin's impairments or some combination thereof met or equaled a listing in Appendix 1, then he would have been required to find her disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). However, having determined otherwise, the ALJ proceeded on, making an RFC determination and addressing Steps Four and Five, in which he discussed Ms. Curvin's credibility, her symptoms, and the effect of those symptoms on her ability to work. (Tr. 17–21).

Given this backdrop, the Court must conclude that the ALJ erred in making his Step Two determination. The ALJ did not make a credibility finding before reaching his Step Two determination, which, itself, is an error under SSR 96-7p. SSR 96-7p (requiring the ALJ to make a credibility determination regarding claimant's ability to do work prior to reaching a conclusion on Step Two). Moreover, the ALJ entirely disregarded Ms. Curvin's own reports regarding the functionally limiting effects of her impairments. This was an error, because "[a] determination that an individual's impairment[] is not severe requires careful evaluation of the medical findings that describe the impairment[]…and an informed judgment about the limitations and restrictions the impairment[] and related symptom(s) impose," which, itself, requires a credibility assessment. SSR 96-3p (citing SSR 96-7p). In other words, the ALJ's Step Two discussion of whether Ms. Curvin's impairments were severe should have included more than objective medical evidence alone; that discussion should have also

included a discussion of Ms. Curvin's limitations and restrictions stemming from her symptoms. SSR 96-3p. It is clear that the ALJ's Step Two discussion did not include either of those requirements—neither a credibility determination (which, theoretically, could also have occurred before Step Two) nor a discussion beyond the objective medical evidence—and therefore failed to comply with the Social Security Administration's own rulings.

The ALJ's failure to follow the Social Security Administration's rulings is an error that may warrant reversal. *See, e.g.*, 20 C.F.R. 402.35(b)(1) (noting that rulings are "binding on all components of the Social Security Administration" and "represent precedent [*sic*] final opinions and orders and statements of policy and interpretations that we have adopted."); *Liskowitz v. Astrue*, 559 F.3d 736, 744–45 (7th Cir. 2009)[2]; *Prince v. Sullivan*, 933 F.3d 598, 602–03 (7th Cir. 1991) (holding that it is appropriate to hold ALJs to the Social Security Administration's rulings).

In *Liskowitz*, the Seventh Circuit "assume[d] without deciding" that an ALJ's violation of Social Security Ruling 96-8p would constitute "reversible error." 559 F.3d at 745. Though it is perhaps dicta, that language clearly sets forth the Seventh Circuit's belief that the Social Security Administration is

---

[2]*Liskowitz* notes that:

> We generally defer to an agency's interpretations of the legal regime it is charged with administering. However, we are not invariable bound by an agency's policy statements. Since neither party has briefed the issue of the appropriate level of deference to apply to Social Security Rulings, we assume without deciding that violations of Ruling 96-8p constitute reversible error.

559 F.3d at 744–45. This Court will rely on the Seventh Circuit's reasoning that an ALJ's failure to rely on a ruling constitutes reversible error.

bound by its own rulings, and an ALJ's failure to comply with them constitutes an error that warrants reversal. Therefore, on that basis alone, the Court would be justified in reversing the ALJ's decision under review.

The Commissioner seems to recognize as much. In her brief, she argues that the error does not warrant reversal under the Seventh Circuit's decision in *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). In *Castile*, the Seventh Circuit noted that Step Two is "merely a threshold requirement." *Castile*, 617 F.3d at 927. In other words, once the Step Two threshold is crossed—whether it be through a finding of only one severe impairment or of one hundred severe impairments—the Step Two determination no longer matters. That is because, at the remaining steps, ALJs are always still required to examine all of a claimant's impairments. *Castile*, 617 F.3d at 926–27 (citing 20 C.F.R. § 404.1523; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)). Accordingly, it seems that the Commissioner would like the Court to find that the ALJ's error was harmless and does not require reversal under *Castile*'s rationale.

For various reasons, the Court does not believe that application of *Castile* is appropriate, here. The very rationale behind *Castile*—that the ALJ must still examine all of the claimant's impairments at the further steps, even if he finds them nonsevere at Step Two—applies fairly weakly, here. In this case, the ALJ drastically reversed the order of business, placing the credibility determination far after it was required. He should have performed it prior to or during Step Two. Instead, it appears long after the ALJ reached his RFC determination, and even then it appears after the ALJ's boilerplate statement

regarding credibility.[3] In *Castile*, on the other hand, the ALJ at least engaged in a substantive discussion about whether certain of the claimant's impairments should be severe or nonsevere and addressed the credibility of her complaints in that regard. *Castile*, 617 F.3d at 927. There, the ALJ discussed the lack of medical laboratory test results, the fact that the claimant had not made any physical complaints for a long period of time, and the claimant's apparent continued ability to work. *Id.* at 927. Given that the ALJ's error, here, was much more significant than in *Castile*, the Court is reluctant to conclude that the error was harmless. Even though the ALJ went on to the other steps, the magnitude of his error gives the Court pause, as that error very well could have infected all of the ALJ's other determinations at later steps. Moreover, the ALJ in *Castile* found "numerous severe impairments," whereas the ALJ in this case found only one. Finally, the Court notes that the relevant portion of *Castile* is pure dicta: later in the opinion the *Castile* court goes on to say that the relevant portion of its analysis "is of no consequence with respect to the outcome of the case."

For all of these reasons, the Court does not believe that *Castile* applies to make this a case of harmless error; therefore, even if *Liskowitz* does not

---

[3]Here, the Court should note that, while the ALJ did, indeed, employ the boilerplate language that the Seventh Circuit has frequently frowned upon, the use of that language does not, *per se* require reversal. *Pepper v. Colvin*, 712 F.3d 367–68 (7th Cir. 2013). Where, as here, the ALJ actually went on to perform some credibility determination (*see* Tr. 19), the Court likely would have found that the credibility determination was not in error, if it had occurred at the appropriate place. While the use of boilerplate language—especially when dropped into a place it seemingly does not belong, such as before or after the credibility determination is actual made—is confusing, it is not *per se* fatal to the ALJ's decision.

require outright reversal as a result of the ALJ's errors, alone, *Castile* would not save the case from reversal.

### 2.2.2 Step Three

Moreover, *even if Castile* were to apply to prevent reversal of ALJ's Step Two determination, his determination at Step Three was flawed. *Castile* rests on an assumption that, if the ALJ errs at Step Two, he or she may correct that error by analyzing all of the claimant's impairments at Step Three. The problem is that, here, the Court cannot be sure that the ALJ took account of all of Ms. Curvin's impairments in his Step Three determination. At Step Three, the ALJ mentioned that neither a physician nor the objective medical evidence indicated that Ms. Curvin has an "impairment or combination of impairments" that meet a listing in Appendix 1, but that leaves ambiguous which "impairment or combination of impairments" the ALJ considered at Step Three. (Tr. 17). While the ALJ did acknowledge that he "specifically considered the claimant's impairments," he did not provide any details on that statement. He could have: made clear the exact impairments he considered; stated that he considered both severe and nonsevere impairments; at the very least, noted that he considered all of the impairments. Instead, he mentioned only that he considered "the claimant's impairments," which he then went on to lump in with what seems to be boilerplate language regarding his determination that Ms. Curvin's "impairment or combination of impairments" does not meet or medically equal a listing. That failure prevents the Court from meaningfully reviewing his Step Three determination, to answer whether the ALJ actually examined all of Ms. Curvin's impairments.

The ALJ also failed to follow 20 C.F.R. § 404.1529(d)(3)'s requirements at Step Three. The ALJ was required to assess whether Ms. Curvin's "symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment." 20 C.F.R. § 404.1529(d)(3). As already mentioned, the ALJ noted only that "no treating or examining physician has indicated that the claimant has an impairment or combination of impairments that meets or medically equals the severity of a listed impairment," and that he "considered the claimant's impairments" finding "no objective medical evidence of an impairment or combination of impairments of listing level severity." (Tr. 17). Under 20 C.F.R. § 404.1529(d)(3), the ALJ did not need to examine Ms. Curvin's own representations regarding pain or other symptoms if he found a "missing or deficient sign or laboratory finding." But his discussion on this point does not even include any reference to whether Ms. Curvin had a "deficient sign or laboratory finding" that would have prevented her claim from reaching the level of severity required to meet or equal a listed impairment, let alone any discussion of her symptoms. (Tr. 17). 20 C.F.R. § 404.1529(d)(3). The court realizes that the ALJ may believe that his discussion of the physicians' opinions and objective medical evidence should suffice in place of discussing whether Ms. Curvin had a deficient sign or laboratory finding. But his discussion leaves a significant logical gap between point A (his discussion of the physician and objective medical evidence) and point C (his apparent conclusion that it was unnecessary to recount Ms. Curvin's symptoms). Specifically, he leaves out point B (the necessary interim determination that Ms. Curvin had a "missing or deficient sign or laboratory finding"). See 20 C.F.R. § 404.1529(d)(3).

Page 16 of 20

Case 2:13-cv-00123-JPS   Filed 09/23/13   Page 16 of 20   Document 29

Given that the ALJ failed both to follow the Social Security Administration's regulations and to "build an accurate and logical bridge" between the evidence and conclusions, reversal is also appropriate at Step Three of the analysis. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).

2.3     Parties' Discussions Regarding Post-Hoc Arguments

Having determined that it is obliged to reverse the ALJ's decision, the Court turns next to discuss whether Ms. Curvin is correct in her assertion that the Commissioner has made sanctionable post-hoc justifications. Subsumed in this discussion will be a short note on the ALJ's RFC, Step Four, and Step Five determinations.

The Court begins by noting that there is a very thin line between sanctionable post-hoc justification and permissible legal arguments. In the Court's view, a sanctionable post-hoc justification occurs when the Commissioner fabricates some piece of the record or analysis that the ALJ did not supply. Hypothetically, if the Commissioner were to assert that "the ALJ relied on claimant's statement that she runs twenty miles per day," but the ALJ's decision did not include that fact, then the Commissioner's assertion would likely be a sanctionable post-hoc justification (though that determination will likely shift on a case-by-case basis). The key in that scenario would be the Commissioner's whole-cloth creation of justifications for the ALJ's determinations. If the ALJ does not rely on or discuss a fact, then the Commissioner cannot assert that the ALJ did otherwise.

On the other hand, where the Commissioner discusses the legal effect of an ALJ's statements or analysis, the situation is much different. To stay with the hypothetical situation, if the ALJ noted that the claimant runs twenty miles per day, and the Commissioner were later to argue that the ALJ

Case 2:13-cv-00123-JPS   Filed 09/23/13   Page 17 of 20   Document 29

appropriately considered that fact or that the fact was a part of the basis for the ALJ's decision, then such argument likely would not be sanctionable. In that case, the Commissioner is not putting words in the ALJ's mouth or creating justifications out of whole-cloth. Rather, she is analyzing the legal effect of the Commissioner's analysis. In that case, even if the ALJ's decision is not as clear as the Commissioner may assert it is, there is at least a good faith basis for her arguments.

Here, the Commissioner's assertions stay away from venturing into post-hoc justification territory. For example, the Commissioner's assertion that the ALJ relied on Ms. Curvin's statement that she has no mental health issues is based on an actual statement of the ALJ appearing in his decision. (Tr. 20 ("Ms. Curvin alleged no mental health problems.")). Similarly, the Commissioner's discussions regarding Ms. Curvin's sleep disorders and fatigue were based on the ALJ's discussions thereof. (Tr. 20). While the Commissioner's briefs may have ventured somewhat outside of the ALJ's discussion—delving into fatigue, instead of limiting its discussion to the sleep disorder, per se—the fatigue issue was directly related to the sleep disorder. Likewise, the Commissioner limited her Step Two analysis to discussing legal arguments in support of the Commissioner's decision. In her briefs, she noted that the ALJ's Step Two determination was consistent with the objective medical evidence and argued that the *Castile* case should prevent reversal. While the Court disagrees with the latter half of that analysis, the Commissioner should still be allowed to make such legal arguments. Finally, while the Commissioner's assertions regarding the *Dictionary of Occupational Titles* and the plaintiff's potential lack of utilization of services in her senior facility border on being post-hoc justifications, because neither was

referenced by the ALJ, they are not of such great a magnitude that the Court believes they ought be sanctioned in this case. Simply put, the Court can envision a situation in which the Commissioner construed them to be legal arguments, and it would be unduly harsh to impose sanctions in such a case.

3.  CONCLUSION

Because of the ALJ's errors at Steps Two and Three of his decision, the Court determines that it is obliged to vacate and remand that decision to the ALJ. While Ms. Curvin seeks a direct finding of disability and an award of benefits (Pl.'s Br. in Supp. at 25), the Court does not believe that such a disposition would be appropriate. Such an outcome would be "appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (citing *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993); *Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992)). The *Chenery* doctrine makes clear that the Social Security Administration has the responsibility for determining a claimant's entitlement to benefits, *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010), and the Court does not believe it appropriate to override that authority, here, where it is not convinced that "all factual issues have been resolved and the record supports a finding of disability." *Briscoe*, 425 F.3d at 356. The ALJ has been delegated that authority and is most adept at employing the hearing procedures to make disability determinations. The Court, therefore, remands this case to the ALJ to make that determination.

Accordingly,

IT IS ORDERED that the opinion of the ALJ be and the same is hereby VACATED and REMANDED for further proceedings consistent with this opinion.

The clerk of court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of September, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge